**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00044-APM** |
| **v.** | : | |
| | : | |
| **JEREMIAH CAROLLO,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Defendant Jeremiah Carollo to 45 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

### I.    Introduction

Defendant Jeremiah Carollo participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.7 million  in losses.[1]

Defendant Carollo pleaded guilty to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(G).  As explained below, a sentence of 45 days of incarceration is appropriate in this case because Carollo:

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

(1) told his co-defendants, "Let's totally do it" after he observed the skirmish between the police and other rioters on the Upper West Plaza; (2) positioned himself near the front of a large group of rioters that twice breached the police line on the northwest stairs from the Upper West Plaza to the Capitol building; (3) placed his hands on the backs of the rioters in front of him on the northwest stairs, thus adding his weight to the force of the group that was pushing toward and through the police; (4) entered the Capitol through a broken window adjacent to the Senate Wing Door; (5) admittedly coaxed his co-defendants to enter the Capitol after they expressed reluctance to enter; and (6) while inside the Capitol, traveled to the suite of offices for Speaker of the House Nancy Pelosi, and watched as other rioters vandalized an official sign in that area.

The Court also must consider that Carollo's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution.  And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country.  I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates).  Carollo's actions and those of his fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators, and their staffs, and disrupted the certification vote for several hours.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers.  The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  Here, the facts of and circumstances of Carollo's crime, as mitigated by his history and

characteristics, support a sentence of 45 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 40 (Statement of Offense), at ¶¶ 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to Carollo's conduct and behavior on January 6.

*Defendant Carollo's Role in the January 6, 2021 Attack on the Capitol*

About a week before the January 6 riot, Carollo texted co-defendants Cody Vollan and Anthony Carollo to ask if they wanted to attend former President Trump's rally on January 6.  They agreed on a plan to do so.  On January 5, 2021, Vollan and Anthony Carollo drove Vollan's car from their home near Chicago to the Baltimore/Washington International Airport, where they picked up defendant Jeremiah Carollo.  The three men spent the night in a hotel in Washington, D.C., and the next morning took an Uber to former President Trump's rally.

 After the rally, the three men followed the crowd to the Capitol.  They entered the Capitol grounds from the west and made their way to the Upper West Plaza, in an area where other rioters were skirmishing with police officers.  This image shows Carollo and his co-defendants on their approach:



The following image is from a video showing the three men near the area on the Upper West Plaza where police were attempting to keep rioters from advancing on the Capitol:



The video is Exhibit 1 to this memorandum.  In the video, Carollo (in the gray hood and tan jacket) can be heard saying what sounds like, "Let's totally do it."

The following image is from a video that begins with Carollo in a crowd of rioters at the bottom of the north stairway leading from the Upper West Plaza to the Upper West Terrace (sometimes referred to as the northwest stairs). The stairs were partially enclosed at the time by scaffolding that had been erected to create seating for the Inauguration.



The video, in which Carollo's co-defendants (Cody Vollan and Anthony Carollo) are not visible, is Exhibit 2 to this memorandum. About 50 seconds into the video, when Carollo is not visible, the crowd overruns the police guarding the opening to the stairway, forcing them to retreat to a landing toward the top of the stairs. Carollo is next visible about 30 seconds later, on the stairway under the scaffolding, about seven rioters back from the new police line:



Other rioters can be heard shouting, "push!" and other words of incitement.  Carollo placed his hands on the back of a rioter in front of him more than once, thereby contributing to the effort to overrun the police.  The following image is from Exhibit 2 at the 2:19 mark:



The video ends before the second police line is breached.  In his appearances in the video over the course of several minutes on the stairway under the scaffolding, Carollo is not seen or heard acting in an individually aggressive manner, but his mere presence in the mob and his physical support of the rioters in front of him (by placing his hands on their backs) certainly contributed to the mob's ability to overrun the police.

Carollo eventually reunited with Vollan and Anthony Carollo and the men then made their way to the Capitol building, which they entered through a broken window adjacent to the Senate Wing Door around 2:22 p.m.  *See* ECF 40 at ¶ 8.  The following images are taken from surveillance video recorded inside the Capitol as Carollo entered with his co-defendants:





The three men walked together throughout the Capitol for more than 15 minutes, including in the vicinity of Speaker Pelosi's suite and trips through the Crypt and the Rotunda. *Id.* The following image shows them walking through the Rotunda:



The following image shows them walking through Statuary Hall:



They exited the building via the Memorial Door around 2:38 p.m.  *Id.*  Capitol surveillance

video shows them leaving the grounds about 20 minutes later:



*Defendant's Interview*

On November 11, 2021, Carollo agreed to speak to FBI agents about his actions on January 6. He first identified Anthony Carollo as his half-brother and stated the two had different mothers. He next identified Vollan as his cousin, explaining that Vollan was his step-mother's nephew. Carollo then stated that on January 5, 2021, he flew from St. Louis Lambert International Airport (where he worked as a ground agent for Southwest Airlines) to Baltimore/Washington International Airport, where Anthony Carollo and Vollan picked him up in Vollan's vehicle. Carollo explained that the three men first attended former President Trump's rally the morning of January 6, 2021, then walked to the United States Capitol. He stated that he was unsure of how long they were outside the Capitol building before entering it and estimated that it was about one hour. Carollo said he was unsure what side of the Capitol building he was on, but that it was the side with metal scaffolding set up near the steps to the building. He stated that he did not participate in any violence outside the Capitol, or in breaching the Capitol itself. He admitted that he entered the Capitol building through a window that had been broken out near a doorway, and that he was the first to enter the window, followed by Vollan and Anthony Carollo, whom he said he had to coax to enter.

Carollo stated that he was unsure how long he was inside the Capitol building with his co-defendants, and that the three made their way down a hallway and up a stairwell, where they found themselves near the House Speaker's office. There, he observed people vandalizing the placard near the Speaker's office. While inside the Capitol, Carollo heard individuals saying a woman had been shot, which is when the three decided to make their way out of the building. After leaving the Capitol Grounds, they returned to Vollan's vehicle and drove directly back to Chicago Midway Airport, where Carollo took a flight back to St. Louis.

Carollo identified himself and his co-defendants in photos of them taken on the Capitol Grounds on January 6, and stated that he did not recall taking any photos or videos at the Capitol.

*The Charges and Plea Agreement*

On January 14, 2022, the United States charged Carollo by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) & (2) and 40 U.S.C. §§ 5104(e)(2)(D) & (G). On January 19, 2022, law enforcement officers arrested him at his home in Illinois. On February 7, 2022, the United States charged him by information with the same offenses charged in the complaint and, on April 21, 2022, he pleaded guilty, pursuant to a written plea agreement, to Count Four of a Superseding Information charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). As part of the plea agreement, Carollo agreed to pay $500 in restitution to the Architect of the Capitol.

## III.     Statutory Penalties

Carollo now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Carollo faces up to six months of imprisonment and a fine of up to $5,000. Carollo also must pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). Because this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 45 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the United States Capitol on January 6, 2021, defies hyperbole.  It was a criminal offense unlike any other in American history, in that it was a direct assault not only on our government, but on our *system* of government:  it was an attack on democracy itself.  Hostile combatants breached and then stormed the halls and chambers of Congress with the sole purpose of reversing, by force, a United States Presidential election.  Using violence and intimidation, the mob of rioters sought to override and invalidate the votes of millions of Americans.  To put it plainly, the events of January 6 may be distilled as follows:  the rioters beat and injured police officers and destroyed doors and obliterated windows to infiltrate our seat of government because they wanted to force Congress to cancel the certification of the Presidential election and install the loser of that election as the winner.  By its very nature, the attack eludes comparison to other events.

Although each defendant must be sentenced based on his own conduct, this Court should consider that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances.  As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries and roar of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air.  No rioter was a mere tourist that day.  In fact,

Exhibit 1 shows Carollo and his co-defendants standing in the midst of fighting between other rioters and police on the Upper West Plaza, and Exhibit 2 shows him in the thick of a mob that overran the police guarding the stairway from the Upper West Plaza to the Upper West Terrace.

Additionally, while assessing Carollo's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition. Although these factors are neither exhaustive nor dispositive, they help to place each defendant on a spectrum as to his fair and just punishment. If Carollo personally had engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts by Carollo therefore is not a mitigating factor in this misdemeanor case.

As Exhibits 1 and 2 show, Carollo could not have mistaken the events of January 6 at the Capitol as anything other than a riot. Despite what was happening around him on the Upper West Plaza, he followed the advancing mob of other rioters up the steps to the Capitol building, and he entered it by climbing through a window that had been smashed to pieces just over ten minutes earlier. Shards of broken glass littered the floor as he began his 15-minute march through the Capitol.

To his credit, Carollo gave an apparently truthful interview to FBI agents several months before his arrest, and he accepted responsibility and indicated a desire to plead guilty almost immediately after his arrest, even before receiving discovery from the government.    The government is not aware of any social media posts by Carollo regarding the riot.  The nature and circumstances of Carollo's offense—particularly his participation in the mob of rioters who overran the police guarding the northwest stairs—call for a sentence of incarceration.

**B.  The History and Characteristics of Carollo**

Carollo has no criminal history.  At the time of the riot, he had been employed since 2007 as a ramp agent with Southwest Airlines earning $66,500 annually.  He lost that job in April 2022 as a result of his arrest in this case.  Specifically, he was asked to resign after his authorization to enter secure areas of airports was revoked by the Department of Homeland Security.  After a brief period of unemployment, he was hired to work as an HVAC technician earning $15 per hour.

Carollo served in the United States Marine Corps from 1995 to 1999 and enlisted again from 2006 to 2007.  He spent the second stint in Iraq during the war there.  While in the Marines, he received a Good Conduct Medal, Achievement Medal, three service-deployment medals, and an Operation Just Cause Medal.  He was honorably discharged at the rank of Sergeant (E-5).  Following his first period of military service, he worked as a furniture deliveryman from 1999 to 2003 and attended college full-time from 2001 to 2005 without graduating.

He has been compliant with his conditions of pretrial release and has expressed remorse for committing this offense.  He spoke truthfully to FBI agents about his involvement in the offense several months before his arrest, and he sought to plead guilty almost immediately upon his arrest.  To the government's knowledge, he did not boast about his participation in the riot nor did he glorify it on social media.  Although Carollo's military service is laudable, it renders his conduct

on January 6 all the more troubling.  A former Marine must have been keenly aware of the dangers of joining a mob that was assaulting police officers in an attack on the Capitol, and his participation in the riot served as a repudiation of the oath he took to defend the country.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have:  the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed.  When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.  The damage that [Defendant] and others caused that day goes way beyond the several-hour delay in the certification.  It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was [before the riot] for the United States and our diplomats to convince other nations to pursue democracy.  It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Carollo's conduct demonstrates that a sentence of incarceration is necessary to deter him from committing future offenses.  He was a rioter by design, not by chance.  He was the leader of

his two co-defendants at every turn, and he willfully joined a surging mob that twice overran the police on the northwest stairs.  His sentence must be sufficient to deter him from similar criminal activity in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3]  This Court must sentence Carollo based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct:  his participation in the January 6 riot.  Although those like Carollo convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.  A probationary sentence should not be the default.[4]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing).  Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

---

[3] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC).  The government is abiding by its agreements in those cases, but has made no such agreement in this case.  *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Carollo has pleaded guilty to Count Four of the Superseding Information charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

Although hundreds of defendants participated in the Capitol breach on January 6, 2021, many salient differences explain the differing sentences recommended and imposed thus far. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "record" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of co-defendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); s*ee id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  Because the Sentencing Guidelines do not apply here, the court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity.  *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*,

483 F.3d 103, 114 (D.C. Cir. 2007).  The Capitol breach was *sui generis*:  a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and the large number of victims.  Thus, even though many defendants were not charged as conspirators or as co-defendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence. Although no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide comparisons to some of the relevant sentencing considerations in this case.

For example, in the case of *United States v. William Michael Sywak*, No. 1:21-cr-00494-01 (RC), the defendant pleaded guilty to the same charge as Carollo.  Sywak ascended the same northwest stairs to the Capitol as Carollo, but was considerably far behind Carollo in the mob that overran the police, as demonstrated by the following image from a cellphone video that Sywak recorded (the unannotated version of which was Exhibit 4 to the government's sentencing memorandum in Sywak's case):



Carollo

Sywak entered the Capitol through the Senate Wing Door about five minutes after the initial breach there.  Carollo led his co-defendants through the adjacent, busted-out window about four minutes later.  Sywak spent about 20 minutes in the building; Carollo spent about 15.  Sywak lied to the FBI in his interview, whereas Carollo told the truth.  Sywak had a history of substance abuse and violence, as well as a felony conviction; Carollo's record is clean.  Sywak received a sentence including four months of home detention.  Despite Carollo's more positive history and characteristics, his conduct on January 6 calls for a more severe sentence than Sywak's, because Carollo was much nearer the front of the mob that twice overran the police on the northwest stairs, and because he led his co-defendants though a broken window to enter the building.  Carollo's proximity to the tip of the figurative spear that pierced the police lines on the northwest stairs and his leadership among his co-defendants call for a sentence of incarceration.

Other defendants have received custodial sentences even though they were not part of a surge that overwhelmed police.  In *United States v. Boyd Camper*, No. 1:21-cr-325 (CKK), for example, the defendant pleaded guilty to the same offense as Carollo and received a sentence of 60 days' incarceration.  Unlike Carollo, who was near the front of the mob that overran the police on the northwest stairs, Camper viewed from a distance the earlier rioters ascending the stairs.  Camper entered the Capitol through a door rather than a broken window, and walked through some of the same areas as Carollo, including the Rotunda.  Camper recorded and later destroyed video footage of his actions at the Capitol on January 6, and he participated in a news interview that day in which he struck a defiant tone about his actions.  Both Camper and Carollo served in the Marines, but Camper had some troubling criminal convictions in his history.

As shown by the foregoing discussion, there are infinite combinations of aggravating and mitigating sentencing factors among Capitol Riot defendants—especially because "[n]o limitation

shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

Carollo deserves a longer term of incarceration than his co-defendants because his conduct on January 6 was significantly worse than theirs. First, he was near the front of the mob that serially overran two police lines on the northwest stairs, but his co-defendants do not appear anywhere in videos recorded of him at that time. Second, by his own admission he had to coax his co-defendants to enter the Capitol through the broken window. Among the three of them, he was the clear leader and instigator, and his sentence should reflect that distinction.

## V.    The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see,*

*e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, No. 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, No. 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, No. 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Revlett*, No. 21-cr-281 (JEB), ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, No. 21-cr-607 (EGS), ECF 60 (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Ticas*, No. 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022); *United States v. Caplinger*, No. 21-cr-342 (PLF), ECF 74 (D.D.C. August 1, 2022).[5]  In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### A. A sentence imposed for a petty offense may include both incarceration and probation.

#### 1. *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984),

---

[5] In *United States v. Lindsey*, No. 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G).  Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

*codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[6] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[7] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or

---

[6] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part B *infra*.

[7] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

(3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2.  *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result"

26

could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted

27

of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.*

at 808.   In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3)

"[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term

of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal

Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in*

*conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the

defendant is being sentenced for a petty offense, a trial court may properly sentence such individual

to a term of continuous imprisonment for a period of time, as well as a sentence of probation.")

(citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th

ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time

to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only

"different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section

3561(a)(3) functions as an adjective that modifies "offense").   Section 3561(a)(3) does not state

"the same *offense* or a different offense that is not a petty offense," which would imply that the

final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."   The phrase

"that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated

phrase "the same or a different offense."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law:*

*The Interpretation of Legal Texts* 148 (2012).   Had Congress sought to apply the phrase "not a

petty offense" solely to "different offense," the "typical way in which syntax would suggest no

carryover modification" would be some language that "cut[s] off the modifying phrase so its

backward reach is limited."  *Id.* at 148-49.   And while the indefinite article "a" might play that

role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with

icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In

other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), ECF 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Carollo pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

### 1. Relevant background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[8]

### 2. Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above

---

[8] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[9]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## VI.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Carollo to 45 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution. Such a sentence

---

[9] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Carollo's liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility for his crime.

<div style="margin-left: 40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

</div>

By:    s/ *Joseph DeGaetano*
        Joseph DeGaetano
        TN Bar No. 021448
        Assistant United States Attorney
        District of Columbia
        Capitol Riot Detailee
        555 4th Street, NW,
        Washington, D.C. 20530
        Telephone No. (423) 385-1345
        Joseph.Degaetano@usdoj.gov

## CERTIFICATE OF SERVICE

On this 1st day of September, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<div style="margin-left: 40%">

s/ *Joseph DeGaetano*
Joseph DeGaetano
Assistant United States Attorney

</div>